**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

MARY ADAMS                                              PLAINTIFF

VERSUS                          CIVIL ACTION NO. 3:04CV313-DCB-JMR

UNITED STATES OF AMERICA                                DEFENDANT

consolidated with

MARY ADAMS                                              PLAINTIFF

VERSUS                          CIVIL ACTION NO. 3:03CV1129-DCB-JMR

UNITED STATES OF AMERICA                                DEFENDANT

## BENCH OPINION

This matter came on for trial before the Court without a jury on May 8-9, 2006.  The evidence being closed and both sides having finally rested their respective cases, the Court, after due consideration of the evidence of record, makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52:

## FACTS

Dr. Dennis Adams ("Dr. Adams") was employed by the federal government as a general practitioner at the Family Health Care Clinic in Mendenhall, Mississippi. Mary Adams ("Ms. Adams" or "the plaintiff"),[1] then forty-six (46) years old, began seeing Dr. Adams as a patient at that clinic on May 31, 1997.[2]  When Ms. Adams first

---

[1] There is no familial relation between Mary Adams and Dr. Dennis Adams.

[2] The evidence on exactly when Ms. Adams began visiting the Family Health Care Clinic is not clear.  The plaintiff asserts that

presented at the clinic, she suffered from Type II diabetes and high blood pressure.  Over the course of the next four and a half years, Dr. Adams assumed primary care over Ms. Adams and treated her on a regular basis not only for diabetes and hypertension, but also for a number of other maladies as they presented themselves.

A urinalysis performed on Ms. Adams in July of 1997 showed that she was excreting 1+ protein in her urine, a sign of diabetic nephropathy as discussed *infra*.  Dr. Adams recognized that Ms. Adams was suffering from that condition, as evidenced by letters which he wrote on her behalf.  <u>See</u> Pl. Ex. 14 & 15.  Ms. Adams, however, testified that Dr. Adams never informed her that she was having kidney problems and never told her of the possibility that she would eventually have to go on dialysis or need a transplant. Dr. Adams, however, claims that he did inform her about these problems.

Over the course of the plaintiff's treatment by Dr. Adams, the physician prescribed a number of medications.  In addition to prescribing medicines to help combat Ms. Adams' kidney disease, Dr. Adams also gave the plaintiff prescriptions for antihistamines and for non-steroidal anti-inflammatory drugs (NSAIDs).  Both of these types of medications are contraindicated with patients with uncontrolled hypertension, such as Ms. Adams.  Other than

---

her first visit was on June 14, 1997; however, medical records from the clinic indicate that Mrs. Adams was seen on May 31, 1997.  <u>See</u> Annual Health Care Form (May 31, 1997) (Pl. 7, at 1).

performing a urinalysis and a blood sugar test on Ms. Adams, Dr. Adams never ordered any other tests which are routinely used to assess the condition of the kidneys.   It is also undisputed that Dr. Adams never referred his patient to a nephrologist, i.e., a kidney specialist, at any point during Ms. Adams' treatment.

On September 29, 2001, Dr. Adams was unable to see Ms. Adams, so the plaintiff went to see another practitioner, Dr. Chip Holbrook.   After being evaluated by Dr. Holbrook, Ms. Adams was referred to a nephrologist, Dr. Bill Moore.   The plaintiff went to see Dr. Moore in late October 2001.   The kidney specialist told her that she was approaching renal failure and that she would need to undergo dialysis[3] or receive a transplant in the future.   Testimony of Dr. Moore, at 11.   Dr. Moore prohibited Ms. Adams from taking any more NSAIDs, changed her blood pressure medications, and also prescribed ACE inhibitors and angiotensin receptor blockers in an effort to slow the progression of her kidney disease.   See Testimony of Dr. Moore, at 15-16.   Ms. Adams was told by Dr. Moore that she needed to track her blood pressure frequently at home,

_____

[3] Dialysis is a process where blood is taken from the body, filtered and then returned.   In an optimal scenario, a patient is prepared for dialysis by having a peripheral vascular access placed in his or her arm.   That process, however, normally takes two to three months before the access is adequately prepared for use.   See Testimony of Dr. Schlessinger, at 25-26.   In emergency situations, which the defendant's expert testified is actually the norm, a temporary catheter has to be placed in the person's neck or groin to perform the dialysis.   See id. at 26.   The peripheral access is then placed for future use.

-3-

along with her blood sugar.  Furthermore, Dr. Moore asked Ms. Adams to collect a 24-hour urine sample and to take it to a hospital lab for analysis.  Testimony of Dr. Moore, at 16-17.  Lastly, Dr. Moore told the plaintiff that she needed to have a renal ultrasound performed.  Testimony of Dr. Moore, at 16-17.  There is no evidence that Ms. Adams did anything that Dr. Moore asked her to do, and the Court finds that she did not make efforts to collect a 24-hour urine sample or to obtain a renal ultrasound so that her kidney function could be properly ascertained.  Though Dr. Moore expected Ms. Adams to return for a followup after having her tests done, the plaintiff never returned to his office.

On December 6, 2001, the plaintiff again saw Dr. Adams.  She presented with complaints of shortness of breath, abdominal pain, pain in her ears and nasal congestion.  She did not tell Dr. Adams that she had visited Dr. Holbrook or Dr. Moore, nor did she mention any concerns she should have had about her kidney function.  She was diagnosed with sinusitis, given a prescription for Zyrtec D and sent home.  Twenty days later, on December 26, 2001, Ms. Adams returned to the Family Health Care Clinic with complaints of swelling of lower extremities and sinus drainage.  She had a blood pressure reading of 220/100, a heart rate of 120, and her urine showed 3+ proteinura and contained some blood.  Additionally, Ms. Adams had gained thirteen (13) pounds over the preceding twenty days.  Dr. Adams did not provide any additional treatment and sent

-4-

the plaintiff home.  Ms. Adams returned to the clinic the next day with shortness of breath and a tachycardic heart rate.  Again, no treatment was given and the plaintiff went home.  On December 29, 2001, Ms. Adams returned to Dr. Adams, complaining of shortness of breath.  Dr. Adams then admitted her to Simpson General Hospital.

At Simpson General Hospital, Ms. Adams was diagnosed with cardiomegaly, congestive heart failure, tachycardia and metabolic acidosis.  She was determined to be gravely ill and was rushed to the University Medical Center via ambulance.  There, she was diagnosed with acute on chronic renal failure, congestive heart failure, pulmonary edema and acidosis.  She was treated at the hospital and remained in the Intensive Care Unit for four days.  Afterwards, Ms. Adams had to have venous stents placed in her arms to allow access for dialysis and must now go to dialysis treatment three times per week.  The plaintiff is currently waiting on a total kidney transplant.

## PROCEDURAL HISTORY

Ms. Adams brings the current medical malpractice action against the United States, inasmuch as Dr. Adams was an employee of the government during the time she was receiving treatment from him.  The plaintiff brings the claim pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, after adequately exhausting her claims with the appropriate governmental agency.

The plaintiff contends that Dr. Adams negligently provided

treatment or failed to provide treatment that either would have prevented or delayed her eventual decline into total kidney failure. Specifically, Ms. Adams claims that Dr. Adams failed to conform to the appropriate standard of care by failing to render an appropriate treatment to adequately control her blood pressure and blood sugars, by prescribing medications that were contraindicated for patients with high blood pressure, by not performing necessary tests for appropriate diagnosis and by not referring her to a nephrologist for evaluation despite continued abnormal test results which should have indicated to him that her kidneys were approaching failure. Furthermore, the plaintiff faults Dr. Adams for failing to recognize the onset of kidney failure in early December 2001, causing her to be emergently admitted to the hospital. She requests that the defendant be assessed damages in an amount equal to her past, present and future medical expenses; past, present and future pain and suffering, including emotional distress; and permanent physical impairment.

**LAW**

*Jurisdiction & Applicable Law*

"The Federal Tort Claims Act grants the District Courts jurisdiction of civil actions against the United States 'for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

−6−

employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" <u>Hess v. United States</u>, 361 U.S. 314, 345 (1960) (quoting 28 U.S.C. § 1346(b)). There is no dispute that Dr. Adams was performing within the scope of his employment with the government when he allegedly rendered negligent care to the plaintiff. Nor is there any dispute that the plaintiff has undertaken all administrative action necessary as a prerequisite to this suit. <u>See</u> 28 U.S.C. § 2675 (requiring that a claimant against the United States have presented his or her claim to the appropriate administrative agency and received a final disposition of the claim from the agency before bringing a lawsuit). Therefore, jurisdiction over this action is proper. Moreover, because the alleged acts and omissions occurred in Mississippi, the law of that state as it applies to the plaintiff's claims of negligence will govern this action.

**_Mississippi Law Regarding Medical Malpractice_**

"In order to prevail in a medical malpractice action, a plaintiff must establish, by expert testimony, the standard of acceptable professional practice; that the defendant physician deviated from that standard; and that the deviation from the standard of acceptable professional practice was the proximate cause of the injury of which the plaintiff complains." <u>Austin v. Wells</u>, 919 So. 2d 961, 966 (Miss. 2006) (citing <u>Brown v. Baptist</u>

<u>Mem'l Hops. Desoto, Inc.</u>, 806 So. 2d 1131, 1134 (Miss. 2002)).  As to the appropriate standard of practice to apply, "Mississippi physicians are bound to adhere to nationally recognized standards of care and have a duty to exercise reasonable and ordinary patient care."  <u>Young v. Univ. of Miss. Med. Ctr.</u>, 914 So. 2d 1272, 1276 (Miss. Ct. App. 2005) (citing <u>Palmer v. Biloxi Reg. Med. Ctr. Inc.</u>, 564 So. 2d 1346, 1354 (Miss. 1990)).  Expert testimony must be proffered to establish both the standard of care and causation.  <u>See</u> <u>Barner v. Gorman</u>, 605 So. 2d 805, 808-09 (Miss. 1992) ("Not only must this expert [testimony] identify and articulate the requisite standard that was not complied with, the expert [testimony] must also establish that the failure was the proximate cause, or contributing cause, of the alleged injuries").

## ANALYSIS

The plaintiff's primary complaint is that Dr. Adams' negligence caused or failed to prevent Ms. Adams from progressing to complete renal failure.  As to that claim, the plaintiff has failed to adequately prove, through expert testimony, that Dr. Adams' treatment was a proximate or contributing cause of the plaintiff's injuries.  All credible testimony, as discussed below, indicates that, at the time that the plaintiff first presented to Dr. Adams, her kidneys were already so severely damaged that progression to renal failure was inevitable.  In order to understand the testimony given by the various experts in this case

concerning causation, it is necessary to first explain diabetic nephropathy and its relation to the progression of kidney disease.

***Diabetic Nephropathy and End-Stage Renal Disease***

The kidneys are a pair of vital organs which operate to cleanse the blood and help to eliminate waste.  As one of the defense's expert testified, one may effectively envision the kidneys as coffee filters for the blood.  In diabetic patients, these filters often suffer from diabetic nephropathy, a condition where, as a result of having elevated glucose levels for sustained periods of time, the kidney function is impaired.  Should the condition be allowed to continue unabated, those patients will begin to suffer structural damage.[4]  Once that damage becomes severe enough, the "coffee filters" of the kidneys will develop holes which begin allowing protein normally found in the blood to escape into the urine.  At first, a person suffering from diabetic nephropathy will pass relatively small amounts of protein, known as microalbuminuria.  As the diabetic's condition worsens, however, the holes in the "filter" will widen and the patient will begin to spill increased amounts of albumin protein, known as macroalbuminuria, along with a variety of other different types of

---

[4] Not all diabetics will develop diabetic nephropathy. The defendant's expert, Dr. Schlessinger, estimates that approximately 25 to 40 out of every 100 diabetics will suffer some structural damage to their kidneys as a result of the condition.  <u>See</u> Testimony of Dr. Schlessinger, at 18.  This estimate includes both Type I diabetics and Type II diabetics.

protein (collectively, "proteinuria").

Diabetic nephropathy may be categorized into two phases, incipient diabetic nephropathy and overt diabetic nephropathy. Physicians distinguish between the two based upon the amount of protein spillage in the patient's urine, detected through the use of two types of urine tests.  In incipient diabetic nephropathy, the protein level in the urine is so small that a special test, known as a microalbumin assessment, must be ordered to detect the leakage.  Testimony of Dr. Schlessinger, at 9.  In overt diabetic nephropathy, however, the amount of protein is prevalent enough that it can be detected through a simple "dipstick" test.  The amount of protein detected on a dipstick test translates into "levels", per the following framework:

| LEVEL | mg of protein/decileter |
|-------|-------------------------|
| 1+    | 30+ mg                  |
| 2+    | 100+ mg                 |
| 3+    | 300+ mg                 |

See Testimony of Dr. Moore, at 25-26.

In contrast to these 1-3+ levels which are derived by testing a single sample of urine, a normal person, i.e., one not suffering from any form of diabetic nephropathy, will spill no more than 150 milligrams of protein in the course of a full twenty-four hour period.  See id.  Normal persons will not present a positive dipstick test for protein off of a single sample of urine.  On the other hand, whenever a diabetic patient dipstick tests positive for macroalbuminara, regardless of what level is indicated, that person

-10-

is suffering from overt diabetic nephropathy.  <u>See</u> Testimony of Dr. Schlessinger, at 10.

Diabetic nephropathy is a common cause of renal disease.  <u>See</u> Hans-Henrik Parving, <u>Diabetic nephropathy: Prevention and treatment</u>; Vol. 60(5) pp. 2041-2055 (Int'l Society of Nephrology, Nov. 2001) (Pl. Ex. 28).  The progression of renal disease is marked by "stages".  In Stage 1 and Stage 2, the renal function is affected by elevated glucose levels, though no structural damage has yet impacted the kidneys.  Testimony of Dr. Schlessinger, at 8-9.  When structural damage does occur and microalbuminuria begins presenting in the urine, the patient has progressed to Stage 3.  Testimony of Dr. Schlessinger, at 9.  The patient has reached Stage 4 when macroalbuminuria is detected in his or her urine, the presence of which indicates that the structural damage to the kidney has become severe.  Stages 1-3 all relate to incipient diabetic nephropathy, and Stage 4 relates to overt diabetic nephropathy.  <u>See</u> Testimony of Dr. Moore, at 34.  The two urinalysis tests described earlier can distinguish between whether a person is in Stage 3, shown by the presence of microalbuminuria, or in Stage 4, shown by the presence of macroalbuminuria.

The final "stage" in the progression of this disease is known as End-Stage Renal Disease ("ESRD").  ESRD is essentially kidney death, where the kidneys no longer function at a level necessary to sustain a person's life.  Once ESRD develops, it is fatal without

-11-

medical treatment. The patient will need to either undergo dialysis, an exhaustive process which requires the person to visit a special clinic three times a week for a number of hours on each visit, or will need a kidney transplant. See Testimony of Dr. Moore, at 11-12.

### Causation of ESRD not shown

When Ms. Adams first visited the Family Health Care Clinic in 1997, macroalbuminuria was detected in her urine via the dipstick test. Thus, the plaintiff was already in Stage 4 renal disease when Dr. Adams first began treating her. The relevant question for the Court, then, is whether Dr. Adams, through his allegedly negligent conduct, caused or failed to prevent Mrs. Adams' progression from Stage 4 to ESRD. The plaintiff submits the testimony of Dr. James Jefferson on this point. Dr. Jefferson is an emergency room doctor who, in the past, was board certified in family practice.[5] He testified at trial that he believed that patients exhibiting up to 3+ proteinura who received adequate treatment could be prevented from progressing to ESRD.

In counterpoint, the government elicited testimony from other physicians who contradicted Dr. Jefferson's opinion. Dr. James

---

[5] At trial, Dr. Jefferson represented himself as being currently board certified in family practice. That certification, however, is time limited. During voir dire, the witness admitted that he had not taken the exam to re-certify in that area. Nonetheless, the Court did allow Dr. Jefferson to testify as an expert in the field of general medicine.

-12-

Bill Moore, who practices as a nephrologist[6] and who had seen the plaintiff prior to her renal failure, elaborated on the difficulties, if not near impossibility, in preventing a Stage 4 patient[7] from progressing to ESRD:

> Up to Stage 3, "if you're able to get that patient to make some radical changes, you can absolutely prevent diabetic kidney failure."

Testimony of Dr. Moore, at 31.

> "When a patient comes to the office and our nurse dipsticks the urine, and it is even trace positive, that patient has progressed on beyond the stage 3 diabetic kidney failure, which some experts feel is a stage at which you can arrest or stop the progression of diabetic kidney failure. . . . So just the dipstick urine protein does help me, because even if it is just slightly positive, that patient is done.  We simply cannot prevent them from proceeding to total kidney death."

Testimony of Dr. Moore, at 38.

> "[W]hen a person reaches stage 4 diabetic kidney disease, whether they see me or see a good family physician or go to the world-famous Mayo Clinic, if they're in stage 4 diabetic kidney disease, they will need some form of dialysis or transplant fairly soon."

Testimony of Dr. Moore, at 12.  Towards the conclusion of Dr. Moore's testimony, the Court asked the physician whether, in his

---

[6] Dr. Moore is board certified in internal medicine, critical care and nephrology.  See Testimony of Dr. Moore, at 4.  His practice has been limited to the field of nephrology for over a decade.  See id. at 5.

[7] Again, any patient exhibiting macroalbuminuria, whether it is at a 1+, 2+ or 3+ level, is considered to be in Stage 4 kidney disease.

expert capacity, he felt there was any disagreement in the field as
to whether a doctor could prevent a Stage 4 patient from
progressing to total kidney failure:

> COURT:          Do you have an opinion as to
>                 whether or not this is an
>                 area where there is a
>                 legitimate disagreement among
>                 doctors in your field of
>                 practice, that is, disagreement
>                 about whether or not it is
>                 reversible or irreversible once
>                 you have a positive dipstick?
>
> DR. MOORE:      There is no two schools of
>                 thought. There certainly is
>                 not. I wish there was.

Testimony of Dr. Moore, at 39-40.

The defense also produced expert testimony from Dr. Shirley
Schlessinger, a transplant nephrologist at the University of
Mississippi Medical Center,[8] to buttress Dr. Moore's opinions:

> "Stage 4, I would say -- and nothing's a
> hundred percent, but the vast majority of
> people who had dipstick-positive protein in
> the '90s virtually all went on. We're doing a
> little better now, and so we do have some
> patients now that may not go all the way. But
> the vast majority do."

Testimony of Dr. Schlessinger, at 11.

> GOVERNMENT:     And when Dr. Adams saw [the
>                 plaintiff] and she was at stage 4 at
>                 that time, was there any action that
>                 could have been taken to stop Mrs.
>                 Adams from going down what they call
>                 -- what you all call the slippery

---

[8] Dr. Schlessinger is board certified in internal medicine and
in nephrology. See Testimony of Dr. Schlessinger, at 4.

-14-

slope?

DR. SCHLESSINGER:   . . . It is a slippery slope.  I personally believe that if I had a hundred Mrs. Adams and they were seeing a hundred different doctors, that 99 out of those hundred would have exactly the same outcome that Mrs. Adams has had.

Testimony of Dr. Schlessinger, at 12.

The plaintiff attempts to counter the strength of the defense's expert testimony through reliance on an article published by the International Society of Nephrology.[9]  See Hans-Henrik Parving, Diabetic nephropathy: Prevention and treatment; Vol. 60(5) pp. 2041-2055 (Int'l Society of Nephrology, Nov. 2001) (Pl. Ex. 28).  The plaintiff claims that the article states that "patients with Diabetic Nephropathy, characterized by persistent albuminuria and high blood pressure, results in 25% to 42% of those patients having ESRD."  Under the plaintiff's reading of the article, then, it would appear that 58% to 75% of people who present albuminuria in their urine do not progress to ESRD.  Unfortunately for the plaintiff, this is not what the article says.  To quote Dr. Parving, "Diabetic nephropathy has become the leading cause (25% to 42% of patients) of end-stage renal disease in Europe, Japan, and the United States."  Parving, (unnumbered) at 3.  The logical reading of this quote, combined with Dr. Schlessinger's testimony,

_____

[9]  Dr. Schlessinger testified that the article was authoritative in the field of diabetic nephrology.  See Testimony of Dr. Schlessinger, at 30.

is that out of the entirety of ESRD cases, 25% to 42% of them were
caused by diabetic nephropathy.  See Testimony of Dr. Schlessinger,
at 33.   In other words, ESRD can be caused by more than just
diabetic nephropathy, though diabetic nephropathy is the leading
cause of the disease.  The article, therefore, does not support the
plaintiff's contention that Mrs. Adams' renal failure could have
been prevented had Dr. Adams provided the proper medical care.[10]

The Court has carefully weighed the contradictory testimony
given by the plaintiff's expert and the defendant's experts,
including not only their relative qualifications and experience in
the field of nephrology, but also the witnesses' general demeanor
at trial.   It is the Court's conclusion that the defendants'
experts are more credible in the field of nephrology, and,
therefore, their testimony will be taken as evidence of the
unfortunate scientific realities regarding ESRD.   Under their
tutelage, it is apparent that modern medical practice is unable,
except perhaps in an exceptionally rare case, to halt the
progression of renal disease in a patient who presents with Stage
4 complications.   Therefore, inasmuch as the plaintiff first
presented at the Family Health Care Clinic in Stage 4 renal

---

[10] Moreover, the article refers, in general, to those patients
with "albuminuria".   It makes no distinction between those with
microalbuminuria and those with macroalbmuinuria.  As testified to
by all experts, persons presenting with microalbuminuria do not
necessarily progress to ESRD.  Ms. Adams, however, first presented
to Dr. Adams with macroalbuminuria in her urine.

disease, Dr. Adams' alleged negligence could not have caused Mary
Adams' inevitable progression to complete renal failure, nor could
he have likely prevented that outcome even if his treatment had
been optimal.

**_Causation as to speeding up or failing to delay onset of ESRD not
shown_**

In light of this conclusion, it is necessary for the Court to
progress to another question, "Did Dr. Adams' alleged negligent
acts hasten the onset of the plaintiff's ESRD, or through inaction
did he negligently fail to delay the progression of the disease?"
While it is clear from the expert testimony that the eventual
progression of Stage 4 to ESRD is inevitable, there is a
considerable variance in the amount of time it takes different
patients to progress. <u>See</u> Testimony of Dr. Schlessinger, at 12.
The general range given by Dr. Schlessinger is that ESRD occurs
somewhere between two (2) and ten (10) years after macroalbuminuria
is detected in the urine. Testimony of Dr. Schlessinger, at 38–39.
Dr. Schlessinger also explained that the rate of progression
depends on many factors, including genetics, and that even a
patient who received optimal treatment and was fully compliant may
decline into ESRD faster than a patient who did nothing to attempt
to treat the disease. <u>See</u> Testimony of Dr. Schlessinger, at 12–13.
Both Dr. Moore and Dr. Schlessinger testified that optimal care,
including controlling the patient's high blood pressure and blood
sugar as well as avoiding contraindicated medicines, <u>may</u> delay the

–17–

onset of ESRD, but neither expert opined as to the likelihood of successfully delaying ESRD. <u>See</u> Testimony of Dr. Moore, at 41-42 (stating that uncontrolled blood pressure and the use of contraindicated medicines "potentially" could contribute to the kidney injury); Testimony of Dr. Schlessinger, at 38 ("It is possible that it could have taken a while longer for [the plaintiff] to [progress to ESRD] if her blood pressure ha[d] been perfectly controlled"). Nor did either expert express any amount of certainty as to how long of a delay could be obtained under proper care.

At the conclusion of the trial, the Court posed the following question:

> How could [renal failure] have been either
> avoided or delayed? And if it could have been
> delayed, I'd like for plaintiff's counsel to
> inform the court as to how and how long could
> it have been delayed. Where is there in this
> record any proof as to how long it may have
> been delayed? And several of the physicians,
> the experts, did opine about it; but their
> testimony was inconclusive, and I think it
> probably is because they don't know. Any
> answer to that question, it seems to me, would
> be based upon speculation.

The Court has received the plaintiff's response to this query; however, that memorandum fails to identify any evidence in the record concerning the <u>likelihood</u> that her ESRD could have been delayed, nor does it point out where an expert testified as to the probable <u>length of time</u> her renal failure could have been delayed. Instead, the plaintiff merely states that all the experts opined

-18-

that, in some patients and under some circumstances, the onset of
ESRD could possibly be delayed.

Under Mississippi law, causation shown by "medical testimony
is not probative unless it is in terms of probabilities and not
possibilities." Pittman v. Hodges, 462 So. 2d 330, 333-34 (Miss.
1984). See also Scott County Co-Operative v. Brown, 187 So. 2d 321
(Miss. 1966) (holding that doctor's opinion that the medical
condition "could have been caused" by the accident was insufficient
to establish causal connection). Therefore, the plaintiff, who
bears the burden of establishing each element of her case, has
failed to show that Dr. Adams' alleged negligent treatment either
caused, hastened or failed to delay the onset of her eventual
progression to ESRD.

**_Failure to properly diagnose renal failure and need for emergent_
_care_**

The plaintiff also claims that the defendant is responsible
for damages resulting from her need to be emergently admitted on
December 29, 2001. Expert testimony indicates that Dr. Adams
failed to properly diagnose the plaintiff's progression to renal
failure in December 2001. See Testimony of Dr. Schlessinger, at
43-44. Dr. Adams, himself, admits that he improperly diagnosed the
plaintiff with sinus problems and that he should have recognized
that Mrs. Adams kidneys were failing. Moreover, given the
realities involved with diabetic nephropathy and the fact that Ms.
Adams' decline to renal failure was almost a foregone conclusion

-19-

when she first presented in 1997, Dr. Adams should have been especially attentive to any sign of renal failure.  As the Court noted in its concluding remarks at trial, Dr. Adams was undoubtedly cavalier in his treatment of Ms. Adams throughout the time that she saw him, but especially so in regard to her visits in December 2001.

The Court finds that, under a national standard of care as set forth by the various experts who testified in this case, Dr. Adams should have recognized the plaintiff's impending kidney failure on December 6, 2001.  Dr. Adams breached his duty to provide competent medical care to Ms. Adams by not taking immediate and necessary action to provide for her condition.  Dr. Schlessinger testified that had Dr. Adams properly diagnosed Ms. Adams in early December, she could have likely been treated in such a way that she would not have had to have been rushed emergently to the hospital.  Testimony of Dr. Schlessinger, at 43-44.  Therefore, the Court finds that Dr. Adams' was negligent in his treatment of the plaintiff in December 2001, and that the defendant is liable for those damages stemming from that negligence.

The Court also finds, however, that Mrs. Adams was not a model patient, and that she bears part of the blame for her emergent admittance on December 29, 2001.  A patient may be held contributorily negligent where his or her own conduct causes or aggravates the injury.  Reikes v. Martin, 471 So. 2d 385, 389

-20-

(Miss. 1985).  Testimony at trial revealed that the plaintiff had been told by Dr. Moore in no uncertain terms that her kidneys were failing and that she would need to go on dialysis in the future. Ms. Adams, made aware that she needed to make preparations for dialysis, chose not to have the tests recommended by Dr. Moore done, nor did she mention her visit with Dr. Moore to Dr. Adams or otherwise inform her primary caregiver about any concerns she reasonably should have had about the state of her kidneys. Whatever the reasons behind this omittance, Ms. Adams made a conscious decision to not prepare herself for dialysis.  Even if she did not believe Dr. Moore's prognosis, it was unreasonable for her to not mention the concerns of a kidney specialist to Dr. Adams.  Had she pursued treatment with Dr. Moore or, at the least, told Dr. Adams about that visit, it is doubtful that the plaintiff would have needed to be admitted emergently in December with congestive heart, renal and pulmonary failure.  See Testimony of Dr. Schlessinger, at 44-45. The Court finds that Mrs. Adams negligent conduct contributed to thirty-five (35) percent of the damages as described below.

**Measure of Damages**

The total costs of Ms. Adams' hospitalization for renal failure, pulmonary failure and congestive heart failure is

$20,497.06.[11]  The Court finds that this amount is reasonable and that it is attributable, in that portion as described above, to the negligence of Dr. Adams.

The plaintiff also requests damages for pain and suffering. Both the plaintiff and her mother testified that in the twenty-three (23) days between Adams' visit to Dr. Adams on December 6 and her emergent admittance on December 29, the plaintiff suffered from shortness of breath and swelling.  The Court finds that the plaintiff should be compensated for this suffering, which could have been alleviated had Dr. Adams properly diagnosed the plaintiff, in the amount of $10,000.00, to be apportioned as discussed above.  Lastly, the plaintiff also spent four days in the intensive care unit.  Testimony at trial revealed that Adams suffered a tremendous amount of anxiety from her need to be admitted to the hospital and that, at least for some period of time, there was some fear that she would not survive the incident. The Court finds that the plaintiff should be compensated for the pain and suffering associated with her admittance to the intensive care unit in the amount of $15,000.00, to be apportioned as discussed above.

Therefore, the total compensation for the costs associated

---

[11] Simpson General Hospital charged Ms. Adams $453.00 for the care provided to her on December 29, 2001.  See Pl. Ex. 1.  Ms. Adams incurred $20,044.06 in charges from the University of Mississippi Medical Center for her stay there from December 29, 2001 to January 3, 2002.  See Pl. Ex. 3.

with Adams' emergent treatment and for her pain and suffering is $45,497.06.   Factoring in Adams's contributory negligence, the Court awards the plaintiff $29,573.09.

**CONCLUSION**

For the reasons set forth above, the plaintiff is entitled to have judgment entered on her behalf.   Accordingly,

IT IS HEREBY ORDERED that the plaintiff shall submit a proposed judgment as described above within fifteen (15) days from entry of this order;

SO ORDERED, this the 13th day of July, 2006.


                                        S/DAVID BRAMLETTE
                                        UNITED STATES DISTRICT JUDGE